Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                 CASE NO. 15-22013-CIV-ALTONAGA/O'SULLIVAN
3
4
     SONIA SORDO,
5
               Plaintiff,
6
7                v.
8
     TRAIL AUTO TAG AGENCY,
9    INC.,
10             Defendant.
11   _____/
12
13              The Law Offices of Eddy O. Marban
               1600 Ponce De Leon Boulevard, Suite 902
14                  Coral Gables, Florida 33134
                       December 10, 2015
15                   10:30 a.m.-12:47 p.m.
16
                    DEPOSITION OF SONIA SORDO
17
18
19      Taken before Stefany De Leon, Professional Court
20   Reporter and Notary Public in and for the State of
21   Florida at Large, pursuant to Notice of Taking
22   Deposition in the above-mentioned cause.
23
24
25

Page 2

1   APPEARANCES:

2

3                   FOR THE PLAINTIFF:

4                   MARTINEZ & SORDO, P.A.

5                   BY BLANCA R. SORDO, ESQ.,

6                   7300 North Kendall Drive, Suite 380

7                   Miami, Florida 33156

8                   305-670-6767

9                   blanca@martinezsordolaw.com

10

11                  FOR THE DEFENDANT:

12                  THE LAW OFFICES OF EDDY O. MARBAN

13                  BY EDDY O. MARBAN, ESQ.,

14                  1600 Ponce De Leon Boulevard, Suite 902

15                  Coral Gables, Florida 33134

16                  305-448-9292

17                  marbanlaw@gmail.com

18

19  ALSO PRESENT:

20

21                  CRISTINA VELARDE, INTERPRETER

22                  RICHARD PRETE

23

24

25

Page 3

1                          INDEX

2    WITNESS                                    PAGE

3    SONIA SORDO

4    Direct Examination by EDDY O. MARBAN, ESQ.,    4

5    Interpreter Certificate of Oath            63

6    Certificate of Oath                        64

7    Certificate of Reporter                    65

8    Read Letter                                66

9    Counsel Read Letter                        67

10   Errata Sheet                               68

11

12

13                    DEFENDANT'S EXHIBITS

14   NUMBER              DESCRIPTION            PAGE

15   Exhibit 1           Complaint              15

16   Exhibit 2           Answers                19

17   Exhibit 3           Medical records        51

18   Exhibit 4           Letter                 53

19

20   *Exhibit Number 3 was retained by Mr. Marban.

21

22

23

24

25

1   THEREUPON:

2                    CRISTINA VELARDE

3        The interpreter herein, was sworn and responded

4   "Yes," to truly and correctly translate English into

5   Spanish and Spanish into English.

6   THEREUPON:

7                      SONIA SORDO

8        Was called as a witness and, having been first

9   duly sworn and responding "Yes," was examined and

10   testified through the interpreter as follows:

11                  DIRECT EXAMINATION

12   BY MR. MARBAN:

13       Q.   Could you please state your name and address.

14       A.   Sonia Sordo.   2231 Southwest 14th Street, Miami,

15   Florida 33145.

16       Q.   And in this case, I have to ask something you

17   would never ask a woman, what is your date of birth?

18       A.   No problem.   April 2nd, 1944.

19       Q.   And can you briefly tell me about your

20   educational background?

21       A.   Okay.   High school in Cuba, some studies of

22   English and typing in Miami English Center.   And then

23   what I've learned working directly with the agency.

24       Q.   Okay.   And you came from Cuba, in what, 1973?

25       A.   1973.

Page 5

1    Q.   And in the United States what did you do for a

2  living?

3    A.   When I came to the U.S. from Puerto Rico, I was

4  always with the tag agency or dealers.

5    Q.   When did you leave Cuba to Puerto Rico?

6    A.   We went from Cuba to Spain and from Spain to

7  Puerto Rico and from Puerto Rico to Miami.

8    Q.   What year did you leave Cuba?

9    A.   '73.

10   Q.   So it all happened in one year?

11   A.   We left in '73, we then arrived here to Miami in

12  '76, and then in 1980 -- we went to Puerto Rico and then

13  in '80 I came to back to Miami.

14   Q.   Not with the Mariel, right?

15   A.   No, no.

16   Q.   All right.  So you told me that you work in the

17  United States primarily in the tag agencies?

18   A.   Yes.

19   Q.   And what was the first tag agency that you worked

20  at?

21   A.   Trail Auto.

22   Q.   And how did you get that job?

23   A.   A friend that worked there.

24   Q.   Who hired you?

25   A.   Paul Prete.

Page 6

1      Q.   Is that person related to Richard Prete?

2      A.   He used to be his uncle.

3      Q.   Who owned the agency back in '73 when you started

4    working, who owned the agency?

5           MS. SORDO:   Objection to form.

6           THE WITNESS:   I'm sorry, I did not start there in

7      '73, I started in 1980.

8    BY MR. MARBAN:

9      Q.   In 1980, who owned the agency at the time?

10     A.   Supposedly, there were four owners, Paul, another

11   older uncle, someone who had nothing to do with the

12   family, and I think that was it.   I believe there were

13   three owners at the time.

14     Q.   Including Richard?

15     A.   Richard was not there at the time.

16     Q.   When did Richard come into the picture in

17   relation to the agency?

18     A.   That I don't know.   I returned to the agency in

19   '91.

20     Q.   I see.   And when you returned in '91, was Richard

21   at the agency?

22     A.   Exactly.

23     Q.   And do you know whether Mr. Richard Prete was an

24   owner of the agency in 1991?

25     A.   I always thought he was.

Page 7

1    Q.   Did you have the same duties in 1991 as you did

2    in the year 2014 when your employment ceased?

3    A.   No.

4    Q.   What duties did you have in the year 1991?

5    A.   I was the receptionist.

6    Q.   And as a receptionist, what did you do, did you

7    greet customers that would come in, did you answer the

8    phone, can you tell me about that?

9    A.   Yes, answer the phone.  If I needed to give out

10   an appointment that were given some points in time.

11   Q.   Did you give those appointments over the phone?

12   A.   Yes, uh-huh.

13   Q.   And the appointments were for what, what were the

14   appointments for?

15   A.   People that wanted to come in and did not want to

16   stand in line for very long.

17   Q.   Is it still possible to make an appointment or

18   was it still possible to do that in September 2014 when

19   you worked there at the agency?

20   A.   As far as I know, yes.

21   Q.   And I assume that at some point in time your

22   duties increased, when did that happen and what did you

23   do in addition to being a receptionist?

24   A.   I worked with the line with the customers as a

25   clerk.

Page 8

1    Q.  Can you explain for the record what working the

2  line means because to us as lay people we don't know, we

3  don't work at tag agencies.  So that the record is

4  clear, what does that mean?

5    A.  Okay.  Sure, I can explain.  The agency opens

6  from 8:30 until 6:00 p.m. there were several groups.  I

7  started early, so I started with the line, and that

8  means that people get in line and you call them.

9    Q.  I see.  So I understand now what you mean by

10  working the line.  What other additional duties did you

11  have over the years?

12    A.  Okay.  I will tell you more or less.  After the

13  line I started working directly as a supervisor directly

14  with Mr. Prete.  There I needed to do several things, I

15  had to handle the -- work the inventory, check the

16  clerks, all the different work -- jobs they did, make

17  sure that everything was working correctly, all the

18  employees.  First of all, I needed to open the office,

19  and to do the beginning, roll the beginning.  In other

20  words, the closing of the day, exactly, and then check

21  to see that the cashier had come in, otherwise I needed

22  to get a replacement for her.  In other words, get

23  everything set so things could start functioning well at

24  8:30.

25    Q.  Is there anything else that you did as a

1   supervisor?

2       A.   Yes.   Solve the problems the employees might

3   have.   For example, if someone didn't know how to do

4   something, I would help out, explain how it was done.

5   And if it was something that was more complicated, then

6   I needed to call Tallahassee, so they would guide us

7   exactly on how to proceed.

8       Q.   And do you recall the year when you become a

9   supervisor?

10      A.   I'm not very, very sure, but I would tell you

11  that started if I started in '91, I believe more or less

12  by '96 or '97.

13      Q.   That's fair enough.   When you were supervisor,

14  what hours did you work?

15          MS. SORDO:   Objection to form.

16  BY MR. MARBAN:

17      Q.   You can answer.   When did you start working and

18  when did you finish working?

19      A.   At the time, back in '97, I'd work from 8:00 in

20  the morning till 5:00 in the afternoon.

21      Q.   Was that five days a week?

22      A.   Plus Saturdays -- every other Saturday.

23      Q.   And Saturdays, what hours did you work?

24      A.   We worked from 8:30 to 4:30.

25      Q.   Any additional duties that you performed in

1  addition to being a supervisor?

2      MS. SORDO:  Objection to form.  You can answer.

3      THE WITNESS:  The truth is that from 8:00 in the

4      morning till 2:30 in the afternoon I dealt with the

5      whole office with exception of the accounting.

6  BY MR. MARBAN:

7      Q.  But I thought you told me you worked until 4:30?

8      A.  For '97, yes.  Let me explain.

9      Q.  Thank you.

10     A.  I suffered an accident in 1997.  I fractured a

11 hip.  I had to be out of work for three months.  I had

12 to go through a surgery and a series of other things.  I

13 came back with a walker.  When I came to interview with

14 Mr. Prete he said to me that at my age it would be

15 better if I worked less hours, so he had me as a part

16 time.  He told me that at that age that he and I were

17 at, it would be better if I worked less hours.  So he

18 started giving me a job from 8:00 a.m. till 2:30?

19     Q.  And you're referring to Mr. Richard Prete,

20 correct?

21     A.  Yes.  I dealt with directly with Mr. Prete.

22     Q.  And do you recall exactly when it was that

23 according to you that Mr. Prete told you that you should

24 work until 2:30 p.m. only?

25     A.  What was it that he told me?

Page 11

1    Q.   No.   When was that schedule created?

2    A.   My accident took place in November of '97, so I

3   was out November, December, I was able to return to work

4   January '98.   And at that time, that's when he gave that

5   schedule.   The job I used to do does not exist anymore,

6   so they gave me this schedule.

7    Q.   Did you tell me that -- did you have a new

8   schedule because of the accident?

9    A.   Due to Mr. Prete told me that he could take me on

10   as a part time, but only as a part time because at our

11   age it would be best if we worked less hours.

12    Q.   And he told you that 17 years ago when you were

13   in your 50s?

14    A.   That's correct.

15    Q.   Were there other older employees -- employees

16   older than 50 in the year 1998 working at the agency?

17    A.   I don't recall very well.   There was also a

18   runner that was terminated because of his age.

19    Q.   Thank you for your answer, but my specific

20   question is do you recall whether in the year 1998 there

21   were older employees, say older than 55?

22    A.   I don't know.

23    Q.   Do you recall whether in the year 1998 there were

24   employees older than 60 working at the agency?

25    A.   No, I don't remember.   I can't answer that.

Page 12

1      Q.   So it wasn't your decision to have a reduced

2   schedule, correct; is that what your testimony is?

3      A.   Yes, yes, it was either that schedule or nothing.

4      Q.   And you did accept that schedule?

5      A.   Yes, yes.

6      Q.   Because if you had a problem with that you would

7   have said no, you would have objected?

8      A.   No, I know I couldn't have.  I wouldn't have a

9   job.

10      Q.   Well, you could have sued the agency for age

11   discrimination then?

12      A.   At that time, I felt as if that place were my own

13   home.  I had no interest in suing anyone.

14      Q.   So in the year 1998 when your hours were reduced

15   according to you due to your age, you did not feel that

16   was discrimination, correct?

17           MS. SORDO:  Objection to form.

18           THE WITNESS:  He explained that that was the best

19        thing, that it would be better for me, more

20        comfortable for me.  I would have time to do more

21        things, and so I was just finishing the surgery,

22        stress, the problems, so I did accept it.

23   BY MR. MARBAN:

24      Q.   Didn't you request that your hours be reduced due

25   to the accident that you had?

Page 13

1    A.   I didn't request that.

2    Q.   Let talk about that accident.  Was it an

3  automobile accident?

4    A.   No.  You want me to explain?

5    Q.   Please.

6    A.   I went with my husband to see a doctor, and as we

7  were leaving it was dark and I fell.

8    Q.   And you never filed suit for that?

9    A.   I did not file it.

10    Q.   Did you make a claim without filing a suit?

11    A.   Well, just a second.  The doctor that owned the

12  location is a friend of Mr. Prete.  When I woke up from

13  the anesthesia, the doctor was next to my bed, and he

14  said to me you're not going to file a suit against us,

15  right?  So when I got to work Mr. Prete also said to me,

16  you're not going to sue my friend because we're friends,

17  and so I -- I didn't want to lose my job.

18    Q.   But you did want to file a suit?

19    A.   I would have done it, but my job was more

20  important at the time.

21    Q.   And what exactly did Mr. Richard Prete tell you

22  back in 1997 when you had that accident?

23    A.   Okay.  When I had the accident as such, I did not

24  really communicate with him.  All I got was a call -- or

25  all we had was a phone call.  That communication

Page 14

1   happened when I went back to work.

2      Q.   So Mr. Prete told you not to file a claim against

3   the doctor, correct?

4      A.   That's correct.

5      Q.   And you didn't object to that?

6      A.   I couldn't.  The position I was in, that was my

7   job that I loved and I wanted my job.  I didn't want to

8   file any type of problem or have any type of problem

9   with him.

10     Q.   What was the doctor's name?

11     A.   Echenique.

12     Q.   Can you spell that for us?  Maybe the interpreter

13  can.

14     A.   E-C-H-E-N-I-Q-U-E.

15     Q.   Something like that?

16     A.   Yes, yes, in Coral Way.

17     Q.   Do you remember his first name?

18     A.   I don't know.  I could look it up, but I don't

19  remember.

20     Q.   Do you remember what type of doctor he was?

21     A.   Neurologist.

22     Q.   And you were going to see the doctor -- was your

23  husband going to see the doctor or were you?

24     A.   My husband.

25     Q.   Okay.  So in addition to Mr. Prete telling you to

Page 15

1    not sue the doctor, he also told you, you were too old

2    and your hours were going to be reduced back in 1997,

3    correct?

4        A.   That's correct.

5        Q.   Are you familiar with the ages for others

6    employees that worked at Trail Auto Tag Agency back in

7    the year 2014?

8        A.   I was the oldest.

9        Q.   Do you know how old other employees were back in

10   the year 2014 when you were working at Trail Auto

11   Agency?

12       A.   I don't know the exact ages, but I know they were

13   in the 40s, 50s.

14       Q.   In 2014, were there any other employees working

15   in their 60s?

16       A.   No, I don't know the exact ages.

17       Q.   All right.   I'm going to show you a copy of the

18   complaint that you filed in this action against Trail

19   Auto Agency, and we'll work mark it as Defendant's

20   Exhibit Number 1 for ID.

21            (The complaint was marked as Defendant's

22   Exhibit 1 for identification.)

23            MS. SORDO:   Just look at the paper.

24   BY MR. MARBAN:

25       Q.   All right.   Let's go to paragraph number eight,

1   second sentence.  It states Prete claimed that he could

2   no longer afford to pay plaintiff.  However, younger

3   employees with fewer years of service than plaintiff who

4   were less qualified than plaintiff or earned higher

5   wages than plaintiff weren't terminated.  And then in

6   paragraph number nine you state at the time of

7   plaintiff's termination she was 70 years old and was

8   defendant's oldest employee.  Along with plaintiff,

9   defendant also terminated a 62-year-old employee with

10  over 35 years of employment.  So who was that other

11  employee who had been there for 35 years and was 62

12  years old?

13     A.   The person that would cover as a cashier, the

14  main cashier.

15     Q.   Do you remember her name?

16     A.   Natty.

17     Q.   Last name?

18     A.   Brizuela.

19     Q.   So you knew Natty Brizuela's age in the year 2014

20  because she had been there working with you for a long

21  time, correct?

22          MS. SORDO:  Objection.  Form.

23          THE WITNESS:  Well, I knew she was in her 60s,

24     but I didn't know exactly.

25  BY MR. MARBAN:

Page 17

1    Q.   Is it fair to say that when you worked with other

2    employees who worked along side of you, you had an idea

3    as to the approximate age of those employees?

4    A.   Approximate, yes.

5    Q.   But you don't recall the ages for other employees

6    at the end of 1997 when you had your accident and the

7    beginning of 1998; is that correct?

8    A.   No.

9    Q.   Okay.   Is it because you forgot or is it because

10   you never knew?

11   A.   It's difficult to know exactly a person's age.

12   We were weren't always telling each other how old are

13   you or...

14   Q.   Okay.   So then going back to my original

15   question:   In the year 1998 you have no recollection as

16   to whether there were other employees that were working

17   at the agency that were older than 60?

18   A.   I don't recall very well, but I don't think so.

19   Q.   Same question for employees that were older than

20   55?

21   A.   At that time, I don't think so.

22   Q.   Okay.

23   A.   Perhaps there was one employee, Angelica Lavin,

24   who had been there from the beginning of the agency.

25   Q.   Is that L-A-V-I-N?

Page 18

1    A.   Yes.

2    Q.   And do you know when Ms. Lavin stopped working at

3  Trail Auto Tag Agency?

4    A.   Not exactly, but it was over ten years ago.

5    Q.   And Ms. Lavin, back in the beginning of 1998, did

6  she work the schedule with longer hours than 2:30 p.m.

7  in the afternoon?

8    A.   Yes, she worked full time.

9    Q.   Do you know whether back then she was older or

10  younger than you in 1998?

11         MS. SORDO:   Objection to form.

12         THE WITNESS:   Let me tell you something first,

13     she always looked older.   It's funny, but it's true.

14  BY MR. MARBAN:

15    Q.   So she looked older, but you don't know how old

16  she was?

17    A.   Not exactly, not exactly.   I believe she's in her

18  80s now.

19    Q.   So what would have made her older than you in

20  1998?

21    A.   It's possible, yes, yes.

22    Q.   But you do know that her schedule was not reduced

23  in 1998 even though she was older than you?

24    A.   No, no.

25         MR. MARBAN:   Okay.   Now, I want to mark as

Page 19

1      Defendant's Exhibit Number 2 your answers to

2      interrogatories and supplemental answers to

3      interrogatories.

4          (The answers to interrogatories have been marked

5   as Defendant's Exhibit 2 for identification.)

6   BY MR. MARBAN:

7      Q.   Please look at them carefully, and tell me

8   whether you recall giving these answers to

9   interrogatories under oath under penalty of perjury?

10     A.   Okay.

11     Q.   You do recall them?

12     A.   I'm looking.

13     Q.   Okay.  I'm sorry.  You meant, okay, I'm going to

14  look at it.  I misunderstood.

15     A.   There's many of them.  I'm going to look at them.

16  Yes.

17     Q.   Okay.  Do you see -- can you locate the

18  plaintiff's supplemental responses to defendant's first

19  set of interrogatories.  Okay.  The first page, under

20  number four, you're describing your duties, first you

21  mentioned receptionist.

22     A.   Uh-huh.

23     Q.   We talked about that already.  Did you continue

24  to be a receptionist throughout the end of your

25  employment?

Page 20

1    A.   No.

2    Q.   When did you stop being a receptionist?

3    A.   By the time I was given other duties, and then

4    they hired another receptionist.

5    Q.   Is that when you became a supervisor?

6    A.   Yes, more or less.

7    Q.   When you became supervisor, did your wages

8    increase?

9    A.   Yes.

10   Q.   Now, were you an hourly paid employee or a

11   salaried employee when you became a supervisor?

12   A.   I don't recall exactly.  For a while there, we

13   were salaried, and after that, we started working with

14   time cards.

15   Q.   So there was a point in time when a time clock

16   was placed on the premises, right?

17   A.   Yes, perfect.

18   Q.   And it was the old-fashioned time clock where you

19   would actually punch -- insert a time card?

20   A.   No.

21   Q.   Was it an electronic timekeeping system?

22   A.   Correct.

23   Q.   Can you describe that for me?

24   A.   A little card, like a credit card.  You could not

25   see the time that it was marking.  It wouldn't mark

1   anything.   There was a time, but it kept marking it

2   electronically into the company system.

3       Q.   Can you describe that electronic system, was it a

4   small machine?

5       A.   Yes.

6       Q.   And to best of your knowledge, did that

7   timekeeping system accurately reflect the hours that you

8   worked?

9           MS. SORDO:   Object to form.

10          THE WITNESS:   As far as I know, yes.

11  BY MR. MARBAN:

12      Q.   At the end of your employment in 2014, were you

13  being paid a salary?

14      A.   No, per hours.

15      Q.   And did it ever occur that you were not paid for

16  all the hours that you worked?

17      A.   No.

18      Q.   You never had a complaint about that?

19      A.   No, no.

20      Q.   So if the time records showed that you worked

21  until a certain time of the day, that would be accurate,

22  correct?

23      A.   Right.

24      Q.   All right.   So according to your testimony, you

25  began leaving at around 2:30 p.m. beginning in January

Page 22

1    1998?

2       A.   Correct.

3       Q.   Since 1998, did you always leave at 2:30?

4            MS. SORDO:   Objection to form.

5            THE WITNESS:   No.

6    BY MR. MARBAN:

7       Q.   Were there times when you left before 2:30 p.m.?

8       A.   At 2:00 p.m.

9       Q.   When did you start leaving at 2:00 p.m.?

10      A.   I would say about six months prior to their

11   firing me.   Could I explain a minute?

12      Q.   Sure.

13      A.   Mr. Prete wanted to me to take a half an hour for

14   a break or lunch with this part time.   So I asked if I

15   could leave half an hour before instead of taking that

16   half an hour in which I really could do nothing.

17      Q.   So it was your decision to have your schedule

18   reduced from 2:30 p.m. to 2:00 p.m. in the afternoon?

19           MS. SORDO:   Objection to form.

20           THE WITNESS:   It was not reduced, that half an

21      hour was not paid for.

22   BY MR. MARBAN:

23      Q.   Okay.   But it was your decision to have to leave

24   at 2:00 p.m. in the afternoon as opposed to 2:30 p.m.,

25   that was your decision?

Page 23

1    A.   Yes.

2    Q.   You wanted to leave earlier?

3    A.   Yes.

4    Q.   Is there a particular reason why you wanted to

5    leave earlier?

6    A.   At the beginning, as I explained, I was not paid

7    for that half hour.  My job many times when I'm

8    receiving the inventory or ordering the inventory, I

9    needed to stop that job, take half an hour, and then

10   come back in order then to leave at 2:30.  So I thought

11   that I could work continually my six hours and then

12   leave, and I start leaving at 2:00.  And that did not

13   happen all the time, that was about six months back.

14   Q.   When you say that didn't happen, you're talking

15   about leaving at two o'clock?

16   A.   Correct.

17   Q.   And if you give up your lunch hour, is it your

18   testimony that from 8:00 a.m. until 2:00 p.m., you did

19   not have lunch?

20   A.   We had a 15-minute break.

21   Q.   And that's when you would have your meal period?

22   A.   Correct.

23   Q.   And that 15-minute meal period was paid for,

24   correct?

25   A.   Yes, yes.

Page 24

1   Q.   But when you had half an hour for lunch that was
2   not paid for?
3   A.   No.   Because you need to punch out to leave and
4   punch in to return.
5   Q.   Were there times you left your employment before
6   2:00 p.m. in the afternoon?
7   A.   In emergency situations.
8   Q.   Okay.   We'll talk about emergency situations in a
9   second, but --
10  A.   No, that's fine.
11  Q.   Back in 2014 and 2013 did you have a regular
12  schedule where you would leave before 2:00 p.m. in the
13  afternoon?
14  A.   Only for about six months more or less prior to
15  the -- in the '14 -- during '14.
16  Q.   Yes.   I got that, but my question --
17  A.   No, not in '13.
18  Q.   So in 2014, do you recall whether you had your
19  schedule at a regular basis was for you to leave before
20  2:00 p.m. in the afternoon?
21  A.   No, no.
22  Q.   So you didn't have a regular where, say, you
23  would leave at 1:30 p.m.?
24  A.   No.
25  Q.   And you told me that you would leave early in

Page 25

1  case of emergencies, what emergencies are you referring

2  to?

3      A.  A doctor's appointment that I could not get until

4  the afternoon.  Normally, I tried to get them after I

5  got out of work.

6      Q.  Okay.  And what kind of doctor were you seeing

7  back in the year 2014?

8      A.  Oh, my primary physician.

9      Q.  Is that Dr. Alvarez?

10     A.  Alvarez is a neurologist/psychologist that I

11  would see at that time.

12     Q.  And when did you start seeing Dr. Alvarez?

13     A.  2014.

14     Q.  And why did you start seeing Dr. Alvarez?

15     A.  I felt very upset.  I felt angry, not at that

16  time yet because I had not been terminated.  I had no

17  idea I was going to be fired from work, but I had

18  personal problems.

19     Q.  So you were altered and upset because of your own

20  personal problems, not because of your job?

21     A.  At that time, I had no problems at work.

22     Q.  Ma'am, I don't mean to be intrusive, but one of

23  the issues in this case is your emotional damages, so I

24  need to ask you about that.

25     A.  No problem.

Page 26

1    Q.   It's my job to do that.

2    A.   No problem.

3    Q.   Thank you.  So tell me about the personal

4    problems you had back when you went to see Dr. Alvarez?

5    A.   My mother was 94.  She had the beginnings of

6    dementia, senile dementia.  I'm the only daughter, so I

7    had to find a person that would care for her and to a

8    certain point, I had to be aware of the situation.

9    Q.   And what was your mother's name?

10   A.   Blanca Suarez.

11   Q.   And did your mother pass?

12   A.   Yes.

13   Q.   When did she pass?

14   A.   October 24th, 2014.

15   Q.   That's my birthday.

16   A.   Wow.

17   Q.   A happy day and a sad day.  So you felt you

18   needed to see Dr. Alvarez because you were upset about

19   your mother.  Did the fact that you had to deal with

20   your mother, did that affect your ability to work for

21   Trail Auto?

22   A.   I don't believe so.

23   Q.   But it did affect you emotionally, didn't it?

24   A.   Yes.  But this was something that I expected.

25   Q.   And did you need to tend to your elderly mother

Page 27

1    during work hours at Trail Auto?

2        A.   No.

3        Q.   So you didn't make phone calls to your mother

4    during working hours?

5        A.   Sometimes, yes.

6        Q.   How often in a given day would you call your

7    mother during working hours?

8        A.   Days before to my being terminated from work,

9    very little because she couldn't speak at the time.

10       Q.   And before that in the year 2014 before your

11   mother was incapable to speak, did you call her more

12   frequently?

13       A.   Two times, three times, it depended.

14       Q.   And were you ever -- how long would you speak to

15   your mother on the phone when you would call her in

16   2014?

17       A.   Five minutes.

18       Q.   Were you ever reprimanded by anybody from Trail

19   Auto for using the phone during working hours?

20       A.   Well, I don't think anyone would do that because

21   everybody at Trail Auto would use the phone the same

22   way.

23       Q.   Is it your testimony that employees at Trail Auto

24   would use the phone excessively, their own cell phone

25   excessively?

Page 28

1          MS. SORDO:  Objection to form.

2          THE WITNESS:  Everybody had a cell phone.

3    BY MR. MARBAN:

4      Q.  Did you see other people making personal phone

5    calls during work hours?

6      A.  See them, yes.

7      Q.  How often?  The employees, did they do that often

8    or was it just occasional?

9      A.  I would see them talking.  I don't know exactly.

10   I was at my post at my job, I wasn't watching them.

11     Q.  Okay.  Going back to my original question.  Were

12   you ever reprimanded for using your cell phone during

13   working hours for personal reasons?

14     A.  No, not that I recall.

15     Q.  Did you use your cell phone to make other

16   personal calls aside from your mother?

17     A.  That wasn't necessary, I didn't need to.

18     Q.  So the only time you would use your cell phone

19   would be to call your mother only, for no other reasons?

20     A.  Basically, yes.

21     Q.  Did you use the cell phone to play games?

22     A.  During my break time.

23     Q.  So during those 15 minutes you would use your

24   cell phone to play games and to eat?

25     A.  Basically, yes.

Page 29

1    Q.   Did you play a game -- starts with Candy

2    something?

3    A.   No, no.

4    Q.   What games would you play?

5    A.   I find words, I don't recall anymore, it's been

6    so long.

7    Q.   And were you ever reprimanded for playing games

8    during working hours on your cell phone?

9    A.   Not that I recall.

10   Q.   Okay.  I am going to go back to Exhibit Number 2,

11   your supplemental responses of your first set of

12   interrogatories.  Here under 4C you state that you were

13   also a report clerk.  What were your duties as a report

14   clerk?

15   A.   Okay.  Since I've done practically every job at

16   that agency during these 23 years, with the exception of

17   the bookkeeping or accounting, there were times when I

18   needed to prepare the report.  If you want me to explain

19   what the report is...

20   Q.   Please do.

21   A.   Okay.  There are X number of clerks there.  Those

22   clerks needed to process transfers and all that work had

23   to be put together.  And then you would have to work

24   something or roll something for that report that would

25   go to the State of Florida.  This document that would be

Page 30

1    sent to the State of Florida had to be -- go together

2    with what the employees were giving me.

3       Q.  How far along were you the report clerk, did you

4    do that towards the end of your employment?

5       A.  I did that job for about two or three years, more

6    or less.

7       Q.  When was that?

8       A.  I would say around 2001, 2002.  I don't know

9    exactly, there were so many chores.  I'm not exactly

10   sure when I did that.  Then they named an employee to do

11   that work, they named someone else.

12      Q.  Now, when you were report clerk, sometimes did

13   you -- were you able to determine whether there were

14   mistakes committed my clerks?

15      A.  Yes.

16      Q.  And isn't it true that sometimes the clerks would

17   issue the wrong license, and then the license would have

18   to be returned to the agency?

19      A.  All the time.

20      Q.  Were you able to determine that from the reports

21   that you prepared?

22         MS. SORDO:  Objection to form.

23         THE WITNESS:  Yes, of course.  Normally what

24      would happen is an employee would prepare transaction,

25      it would have to be voided for some reason whenever

1    they noticed that this tag that had been issued was a

2    mistake, there was an error or whatever, and then that

3    tag was left like up in air.  It was as if we had it,

4    but we really didn't have it.

5  BY MR. MARBAN:

6    Q.  So when that was done, when that mistake

7  occurred, what would the employer from Trail Auto have

8  to do, would they have to call their client back to get

9  the tag back?

10   A.  Normally, they would be sent a letter because we

11  did not take the client's phone number.

12   Q.  And whose duty was it to send the letter?

13   A.  The clerk.

14   Q.  The clerk that commits the mistake?

15   A.  Yes.  Because, we, the supervisors would say to

16  the clerk, this is missing.  Exactly.  And if the tag

17  never showed up, it had to be paid for.

18   Q.  Wasn't there somebody responsible for keeping

19  inventory of the tags?

20   A.  Me.

21   Q.  And wasn't one of your duties to ensure that all

22  the tags were accounted for as the inventory work?

23   A.  I was responsible for checking to see where they

24  were.  Now, if the clerk was asked where is the tag?

25  And they would say to you, I don't have it, at the end

Page 32

1   of the year when we prepared the inventory in September

2   they had to be paid.

3       Q.  And wasn't one of your duties as the inventory

4   clerk to make sure that the company didn't suffer any

5   losses by having to pay for that tag?

6           MS. SORDO:  Object to form.

7           THE WITNESS:  Correct.  When that would happen,

8       if it was not just one plate, but several, that

9       certain amount needed to be paid, we would try to

10      continue as happened in some occasions, we had to try

11      to follow it up, we had to try to find it so the

12      company would not have to pay for it.  From the moment

13      I started doing that task until the end the number of

14      tags that needed to be paid for to the state was

15      reduced.

16  BY MR. MARBAN:

17      Q.  And how do you know that?

18      A.  Because I would write the checks.

19      Q.  But how do you know what happened the year before

20  you were the inventory clerk?

21      A.  I was doing inventory for many years.

22      Q.  When did you become the inventory clerk?

23      A.  I would say about ten years ago.

24      Q.  So sometime in 2005, give or take?

25      A.  Yes.

1    Q.   So assuming you became the inventory clerk in the

2    year 2005, how do you know whether the losses for

3    missing tags were more in the year 2004?   Because I

4    forgot to give you an instruction.   I just want you to

5    tell me as to what you know, we don't want you to guess.

6    And what you remember.

7    A.   From the moment I started doing that job, from

8    the moment I took that position as a clerk, before that

9    I can't know.

10   Q.   Before 2005, the year you took as an example, you

11   don't know what the losses were in relation to tags,

12   correct?

13   A.   No.

14   Q.   And when you became the inventory clerk in

15   approximately the year 2005, were their losses at the

16   end of every year?

17   A.   Of those years that we had to pay over $1,000.

18   Q.   And that was your responsibility, correct?

19   A.   No.

20   Q.   Whose responsibility was it then?

21   A.   I was not authorized to demand that the employee

22   recover the tags.

23   Q.   Didn't you tell me before that you became a

24   supervisor for other employees?

25   A.   Yes, but that was a very limited supervisory

Page 34

1   position always.

2       Q.  Let me see if I understand this correctly.

3   You're the inventory clerk -- I'm sorry, you were the --

4   yeah, you were the person responsible for inventory,

5   you're the supervisor for the clerks for the tags, and

6   you're telling me that it's not your responsibility to

7   ensure that all the tags are accounted for; is that what

8   you're telling me?

9       A.  If I can explain to you, no.  When the error is

10  made, we try to get the clerk to solve it or to send

11  letters or to recover the tags, and if that doesn't

12  happen, there's nothing I can do.

13      Q.  But wouldn't you tell the clerks to make sure

14  that they retrieve the tags so that the company wouldn't

15  have losses at the end of the year?

16      A.  All the time.

17      Q.  And isn't it true that you were also responsible

18  for ordering tags?

19      A.  Yes.

20      Q.  And also receiving the shipments for the tags?

21      A.  Yes.

22      Q.  And when you received those tags, did you have to

23  organize them on the shelves?

24      A.  Yes.

25      Q.  But the one thing that I get from you today is

Page 35

1    that you did not follow up with the clerks to make sure

2    that all the tags were accounted for; is that correct?

3        A.  No, no.  Every day we would prepare a report of

4    all the missing tags, every day.  We would go

5    immediately, did you retrieve this tag?  I have sent

6    this letter, but no one answered.  And there was nothing

7    I could do, only to tell Mr. Prete when it was already

8    -- when the charge would come in, which it would come in

9    the following year.  We would provide the tags this year

10   and the charge would come the next year.  Then I would

11   have to go to the gentleman and explain that this tag.

12        MS. SORDO:  Listen to the translation, it's Mr.

13   Prete.

14        THE INTERPRETER:  Oh, I didn't hear, Mr. Prete.

15   BY MR. MARBAN:

16        Q.  And if the wrong tag was issued to a customer, if

17   that customer were stopped by the police, they would

18   probably get a ticket, correct?

19        MS. SORDO:  Object to the form.

20        THE WITNESS:  Correct.

21   BY MS. MARBAN:

22        Q.  And if the wrong tag was issued and the customers

23   didn't give it back, would you report that to the State

24   of Florida?

25        A.  There was no way of notifying the state for each

1   tag -- tag by tag, no.

2     Q.  So if you knew that the agency issued the wrong

3   tag, it was illegal or it wasn't a valid tag for a

4   customer, nothing else was done by Trail Auto?

5     A.  If we knew exactly what person it had been given

6   to by error, there was a transaction that could be done,

7   a swap, when we knew exactly.  Because otherwise, we

8   were giving a tag to a person that didn't have it and

9   that would be even worse for them.

10    Q.  Didn't you tell me that daily reports were

11  prepared for every transaction?

12    A.  Yes.

13    Q.  And every such report as to each transaction

14  would tell you if the tag was issued erroneously?

15    A.  Exactly.

16    Q.  And is it your testimony that sometimes you knew

17  it was a mistake, but nothing was done other than

18  sending a letter to the customer?

19    A.  When I would come in the morning, the first thing

20  I did aside from the opening up was to roll the report

21  or to prepare the reports of those voids of the previous

22  days.  That's where you could tell that the tags had

23  been issued by error.  Immediately we would go to the

24  clerk and we would ask for that tag in order to sell it,

25  us the supervisors, to make sure that this tag was

Page 37

1  resold.

2  Q.   I'm not sure I understand that because I'm not

3  familiar with the place, but what I understand so is a

4  customer is issued a tag that's not really valid for

5  that customer.  You told me that the first thing that

6  the company would do is send a letter.  Now, if that

7  customer didn't respond after the first letter was sent

8  to them what was done next?

9  A.   They would try to obtain the phone number and

10 call the customer.

11 Q.   And was it your responsibility to supervise the

12 clerk to ensure that that clerk tried to get the tag

13 back?

14 A.   Yes, correct.

15 Q.   And what was the thing you were telling me about

16 replacing tags, what were you talking about?

17 A.   For example, if a person would come in and you

18 know you had given them the wrong tag -- it's a little

19 complicated because you don't work there -- I had the

20 alternative of entering the one that was left at the

21 agency and provide it to the person, provide them the

22 correct one, the one that was correct, but very few

23 times.

24      The normal procedure when that happened and I was

25 there was to place them on a list, try to get them back,

Page 38

1   and go after the clerk, ask them every day, did you find

2   the tag.  And at the end when the inventory report was

3   prepared, there was nothing that could be done by them

4   anymore because it was already being reported that the

5   tag was not sold -- or was sold erroneously, in error.

6      Q.  Did you ever reprimand the clerks for making such

7   mistakes?

8      A.  As far as I was authorized to.

9      Q.  How far were you authorized?

10      A.  Not much.  Mr. Prete sent a memo where he was

11   going to deduct that cost from the employee in order to

12   pressure them so they would get the tags back.

13      Q.  Did Mr. Prete ever hold you accountable for tags

14   that were not accounted for at the end of the year?

15      A.  No.

16      Q.  So you were the inventory person, the supervisor

17   to the clerks, but you held no responsibility for

18   missing tags and moneys that the company had to pay at

19   the end of year; is that your testimony?

20      MS. SORDO:  Object to form.

21      THE WITNESS:  When it was an amount such as the

22      one that happened that appeared in the documents, 20

23      continuous tags, a box, then, yes, I needed to call

24      Tallahassee, all the agencies.  But when we're talking

25      about these that were handed out by error, there was

Page 39

1    nothing else to do but paying them.   And Mr. Prete

2    knew about that.

3  BY MR. MARBAN:

4    Q.  So we talked about the tags that were handed out

5  by error, are there any mistakes committed by the clerks

6  in relation to the tags that caused the company to have

7  to pay the state some money at the end of the year?

8    A.  Everything would be solved.   For example, if we

9  would lift a lien, which is when the car is financed, we

10  would try to include it, we make a correction.

11    Q.  Let me try to ask it in a different way because

12  that's not responsive to my question.   During your

13  tenure as the inventory clerk, were there ever specialty

14  tags that were misplaced?

15    A.  Individual or in amounts.

16    Q.  Either individual or in amounts?

17    A.  The special tags were also sold, but there were

18  also mistakes made with them just like with the regular

19  ones.

20    Q.  Okay.   But then I guess we covered that topic

21  already.   Were there ever misplaced specialty tags that

22  were not issued that could not be found during your

23  tenure as the inventory clerk?

24    A.  There were two episodes and both episodes were

25  solved.

Page 40

1      Q.   When did those two episodes take place?

2      A.   I don't have the exact dates, but I would say

3   about two years, more or less.

4      Q.   And what happened?

5          MS. SORDO:  Objection to form.

6          THE WITNESS:  This was the situation:  You enter

7      into the inventory every Monday to see what tag is --

8      well, not missing, but we need, the level, to make

9      sure the level is low.  You immediately go get --

10     enter the Tallahassee system and place the order,

11     depending on the amount that they would allow us.  We

12     have like a limited number of these special --

13     specially like for UM or Miami Heat, which are the

14     ones are the most sold.  We had a limit.  Let's say we

15     could not order 100.  We had a limit of, perhaps, 50.

16         So we would enter and we would place the order,

17     and that would be recorded, we would get number from

18     Tallahassee.  Then they not always had these tags

19     available, so you needed to call with the number that

20     had been issued by the computer and inquire when were

21     we were going to receive them because we were short.

22     They would explain to me, we do not have the tags.

23     They're being processed.  It's possible that in two

24     weeks, two weeks time, and there was nothing else to

25     do, but wait.

Page 41

1    BY MR. MARBAN:

2       Q.  Any other examples of problems with the inventory

3    that may have caused the company money at the end of the

4    year?

5       A.  Not that I'm aware of.

6       Q.  All right.  Going back to Exhibit Number 2,

7    paragraph 4C.  I think you already talked about backup

8    cashier.  I don't remember, were you the backup cashier

9    towards the end of your employment, at the end of your

10   employment?

11      A.  For a while until I had to start counting the

12   moneys that were deposited every Wednesday.  And then so

13   I stopped because it wasn't correct for me to get the

14   money and count money at the same time.

15      Q.  I see.  So you supervised the balancing of the

16   cash register?

17      A.  Every Wednesday I needed to count the moneys, and

18   then when they would go on vacation for a month or

19   something like that, then I would need to do that job

20   the whole month.

21      Q.  When you say them, who are you referring to?

22      A.  Mr. Prete and his wife.

23      Q.  Does Mr. Prete's wife also work at the tag

24   agency?

25      A.  Yes.

Page 42

1    Q.   And what is her name?

2    A.   Carrie Prete, Caridad Prete.

3    Q.   When did you -- did you work as a backup cashier

4    towards the end of your employment then?

5    A.   I worked as a backup for a very short time.

6    Q.   Let's go to the next section where it says

7    supervisor.  You state in addition to all duties

8    described above, additional supervisor duties included

9    opening the office in the morning, setting up computers

10   for the beginning of the day, and end of previous,

11   counting money in safe, deposit at ATM machine,

12   preparing deposit, keeping track of license plate and

13   decal inventory, ordering license plates and decals,

14   inputting license plates and decals into system, voiding

15   erroneous transactions, answering questions, assisting

16   customers, assisting clerks, communicating to

17   Tallahassee when the system was down or when there was a

18   specific matter only Tallahassee could address,

19   communicating with Miami-Dade County Tax Collector on a

20   regular basis, covering other positions when necessary.

21   Do you agree that those were your duties as set forth in

22   your answers to interrogatories?

23   A.   Yes.

24   Q.   So one of your duties was definitely keeping

25   track of license plate and decal inventory, correct?

Page 43

1      A.   Correct.

2      Q.   And voiding erroneous transactions?

3      A.   Yes.

4      Q.   Now, toward the end of your employment, did you

5  work the line?

6      A.   Every day.  I worked the line every day from 8:30

7  to 10:00.

8      Q.   And why did you stop working the line at 10:00

9  a.m.?

10      A.   The other group would come in, the other crew.

11  We had three groups in ordering to be able to cover the

12  whole schedule from 8:30 to 6:00.

13      Q.   And if the tag agency gets really busy at the

14  line, did you sometimes assist at the line after 10:00

15  a.m. in the morning?

16      A.   If there was an available place or position there

17  and if I had nothing important to do like ordering tags,

18  then yes.

19      Q.   Did you ever complain about having to work the

20  line after 10:00 a.m. in the morning?

21      A.   No.

22      Q.   Were you reluctant to work the line after 10:00

23  a.m. in the morning and in the afternoon?

24          MS. SORDO:   Objection to form.

25          THE WITNESS:   No.

Page 44

1   BY MR. MARBAN:

2      Q.   So you were willing to work the line even after

3   10:00 a.m. in the morning and in the afternoon, correct?

4      A.   Yes.

5      Q.   Isn't it true that it's difficult to deal with

6   the clients that walk into the tag agency?

7           MS. SORDO:   Objection to form.

8           THE WITNESS:   Not for me.

9   BY MR. MARBAN:

10     Q.   Isn't it true that there are times when some

11  clients can be a little bit difficult?

12     A.   Yes.

13          MS. SORDO:   Objection to form.

14  BY MR. MARBAN:

15     Q.   Did you have any problems having to deal with

16  clients that were difficult when it came to the line?

17     A.   Not that I recall.

18     Q.   And you never refused to work the line when asked

19  to do so?

20     A.   Never.

21     Q.   Did you ever ask other employees to assist you

22  with processing transactions?

23     A.   I never asked for assistance.

24     Q.   So all transactions you would complete on your

25  own without asking for help?

1    A.   I didn't need help.

2    Q.   Did you ever help other employees process

3    transactions?

4    A.   Yes.

5    Q.   And how often did that occur on a given day in

6    the year 2014?

7    A.   Quite a bit.

8    Q.   Can you estimate the number of clerks that worked

9    in the year 2014?

10   A.   If you will allow me a minute so I can count

11   them.   I would say we had about three in the dealer

12   department, four, five, six, seven, about ten, more or

13   less.

14   Q.   Do you know whether any other employees ever

15   complained about you to Mr. Prete?

16   A.   Not that I know of.

17   Q.   Are you familiar with the Miami-Dade County

18   Qualified Clerk's Exam?

19   A.   Yes, of course.

20   Q.   Did you ever take that exam?

21   A.   I was never sent for that.   I was never given the

22   opportunity to go.

23   Q.   Did you want to take that exam?

24   A.   If it was good for me, yes, of course.

25   Q.   Well, whether it was good or bad, did --

Page 46

1    A.   Yeah, if I needed to do it.

2    Q.   And didn't Mr. Prete ask you to take that exam?

3    A.   No.

4    Q.   Did you ever take that exam and fail it?

5    A.   No.

6    Q.   Did you ever study for that exam?

7    A.   We had all the folders and we were reading them.

8    Q.   And why were you reading it, if according to you,

9    you were not going to be allowed to take that exam?

10   A.   No, I did not say that I was not going to be

11   allowed, what I said was that he never sent me.

12   Q.   Did you ask him if you could go take it?

13   A.   No.

14   Q.   Did other clerks have that certificate?

15   A.   I believe there's about five or six that have it

16   in the whole agency.

17   Q.   Do you know the name of the certificate, what

18   it's called, is it qualified clerk --

19   A.   Qualified clerk, something like that.

20   Q.   And it would have been a good thing for you to

21   have that certificate, wasn't it?

22   A.   Of course.

23   Q.   And you already told me that you did not ask

24   other clerks to assist you in processing transactions?

25   A.   I don't understand the question very well.

Page 47

1      Q.   Okay.   I'll be happy to clarify it.   A customer

2   comes in, he wants a tag, there's a problem processing

3   that transaction with the customer.   That's the type of

4   transaction I'm referring to.

5      A.   No, no, I never had that necessity.   If I had a

6   problem that I didn't understand, I would call

7   Tallahassee.

8      Q.   You wouldn't ask anybody at the office to help

9   you?

10     A.   Even in the morning when I worked the line the

11   most, I was there alone, alone or there was three of us.

12     Q.   Was there ever a time during your tenure as

13   inventory clerk where the company ran out of tags?

14     A.   What type of tags?

15     Q.   Any type of tags.

16     A.   Some specialized ones.   As I explained before,

17   they were not available.

18     Q.   When you say they weren't available, why weren't

19   they available?

20     A.   Tallahassee had a budget, and they could not have

21   -- order more than the ones that the budget would allow.

22   So they had to distribute them throughout the different

23   agencies.   So they would not send them as soon as we

24   would request them.

25     Q.   So you're telling me that there were tags in

Page 48

```
1    request -- specialized tags -- and they would not be
2    sent to the agency because they were not available?
3        A.   Correct.
4        Q.   Okay.  Now, are you familiar with Kendall Group,
5    the Kendall Group account?
6        A.   I helped a lot with that account.
7        Q.   And in the year 2014, did Trail Auto lose the
8    Kendall Group account?
9        A.   In part.
10       Q.   What do you mean in part?
11       A.   We needed to process some type of work for them.
12       Q.   What type of work did you process for Kendall
13   Group in the year 2014?
14       A.   Basically, what they were doing until I left,
15   they would sell a car, they would prepare some paperwork
16   there at the dealer, and then they would send us that so
17   we could assign the tags and the decals to them.
18       Q.   Okay.  And did there come a time when Kendall
19   Group stopped doing that altogether in 2014?
20       A.   Not as far as I recall.
21       Q.   So to the best of your knowledge, the Kendall
22   Group continued doing business with Trail Auto in the
23   2014?
24       A.   Not at the same level, not the same volume
25   obviously.
```

1    Q.   So according to you, the Kendall Group requested

2    tags directly from Trail Auto before your employment

3    terminated or ceased?

4    A.   I needed to order, receive them, and then enter

5    them in their inventory and assign it to them so they

6    could sell them.

7    Q.   And you did that until the last day you worked?

8    A.   Pretty much, yes.

9    Q.   Did Trail Auto lose part of the business with

10   Kendall Group?

11   A.   Yes.

12   Q.   And what was it that, according to you, Trail

13   Auto lost -- what type of business did Trail Auto lose

14   from Kendall Group in 2014?

15   A.   Well, we were doing all of the work for them.

16   Q.   Okay.  So I want to know what did you lose, what

17   type of business was lost?

18   A.   They lost a lot of money.  The transactions we

19   had were not the same cost as they had been originally.

20   Q.   So what types of transactions did Trail Auto stop

21   doing for Kendall Group in 2014?

22   A.   Process the transfer as such.  They would prepare

23   the transfers for the cars.  So we would supply them

24   with the tags, and obviously, the amount of money coming

25   in decreased enormously and so did the work.

Page 50

1    Q.   So Trail Auto -- I'm sorry, Kendall Group would

2    process a transaction and according to you, Trail Auto

3    would you still supply the tags?

4    A.   As far as I know, until I left, yes.

5    Q.   So then according to what you're telling me there

6    should be -- after the time that you stopped working for

7    Trail Auto there should be checks or income coming into

8    the agency?

9    A.   At a much smaller amount.

10   Q.   And how do you know that it was a much smaller

11   amount?

12   A.   How did I know, because I would make the

13   deposits.

14   Q.   And you remember making deposits all the way

15   through September 2014 when you ceased to be employed at

16   Trail Auto?

17   A.   From Kendall?

18   Q.   Yes, from Kendall.

19   A.   A lot less.

20   Q.   Substantially less, right?

21   A.   Yes, yes.

22   Q.   And had it ever come to your attention that due

23   to the loss of business from Kendall Group that Trail

24   Auto was going to have to lay off some employees?

25   A.   Yes.

1    Q.   And you were one of those employees that was laid

2  off, correct?

3    A.   Yes.

4    Q.   In fact, when you went to Dr. Alvarez, you told

5  Dr. Alvarez that you been laid off from work?

6    A.   Yes.

7        MR. MARBAN:   I'm going to mark as Defendant's

8      Exhibit 3 the medical records from Dr. Alvarez.   And

9      we can agree to keep this confidential, so we'll keep

10     our copy as opposed to giving it to the court

11     reporter.   Okay.

12     (The medical records have been marked as

13  Defendant's Exhibit 3 for identification.)

14  BY MR. MARBAN:

15    Q.   If you go to the next to last page, page six of

16  11, you see the first sentence of the first paragraph.

17  It states the patient was doing very well, but the

18  anxiety was worsened after she was laid off from work.

19    A.   Yes, I see it, of course.

20    Q.   So you understood you were being laid off because

21  of loss of the business from Kendall Group; is that

22  correct?

23       MS. SORDO:   Objection to form.

24       THE WITNESS:   No.

25  BY MR. MARBAN:

Page 52

1    Q.  So you're telling this doctor about all the

2    anxiety and stress that you're suffering, correct?

3    A.  Yes.

4    Q.  And you're claiming that you were unlawfully and

5    unjustly terminated because of your age?

6    A.  Yes.

7    Q.  Yet you didn't think it was important to tell

8    your doctor you had anxiety because you had been

9    unlawfully and unjustly terminated as opposed to telling

10   her you were laid off?

11   A.  I don't recall how I said it, I know I told her.

12   Q.  Right.  And in this case you're claiming Trail

13   Auto should compensate you for your emotional damages,

14   are you not?

15   A.  Yes.

16   Q.  And yet you didn't tell that to your doctor, that

17   you were suffering emotional pain or emotional damages

18   because your employment was unlawfully terminated,

19   correct?

20   A.  I don't think that had anything to do with the

21   case, if I told her or didn't tell her, perhaps I did

22   tell her, I just don't remember.

23   Q.  Well, usually the doctor writes down everything

24   you tell her, right?

25        MS. SORDO:  Objection to form.

Page 53

1    BY MR. MARBAN:

2        Q.   You can answer.

3        A.   Yes, yes, I told her in conversation.  I didn't

4    needs to specify because it's up to her to determine.

5            MR. MARBAN:   All right.   Let's mark as

6        Defendant's Exhibit Number 4 a letter dated September

7        9th, 2014, signed by Mr. Prete.

8            (The letter has been marked as Defendant's

9    Exhibit 4 for identification.)

10   BY MR. MARBAN:

11       Q.   All right.   Are you familiar with Exhibit Number

12   4, this letter?

13       A.   Yes.   I asked the gentleman for it.

14       Q.   And what's the reason you asked Mr. Prete to give

15   you this letter?

16       A.   I wanted to have it in case -- I felt so

17   humiliated that I wanted to have something that stated

18   that I wasn't that useless, that wasteful.

19       Q.   But didn't you need this letter in order to look

20   for other employment?

21       A.   Yes.

22       Q.   And isn't it true that Mr. Prete said that you're

23   an excellent employee in this letter?

24       A.   If it states it.

25       Q.   And you consider yourself to be an excellent

Page 54

1   employee?

2       A.   Yes.

3       Q.   And in this letter, it also states that Sonia

4   Sordo was laid off September 3rd, 2014, due to lack of

5   work?

6       A.   It states it.

7       Q.   So if you're going to look for another job you

8   understood when you went to see Mr. Prete that you were

9   being laid off for lack of work from Kendall Group,

10  right?

11          MS. SORDO:   Objection to form.

12          THE WITNESS:   I asked him for that letter when

13      everything had just happened.   When he called me into

14      the office in order to fire me he said to me, I know

15      that you're going through a very difficult time, but I

16      have to fire you, I have to let you go.   And I said,

17      why me?   I've been with the company for 23 years and

18      I've done all types of work.   And he said to me,

19      there's nothing I can do, but later on I realized that

20      I was the oldest in the group.   And he already had a

21      certain pattern, as people grew older, he would let

22      them go.   So I realized it was not -- but because I

23      was the oldest one in the group.

24  BY MR. MARBAN:

25      Q.   But you did understand when you met with

Page 55

1    Mr. Prete that you were being laid off, that's what he

2    told you, correct?

3        A.   I don't know the difference very well between

4    layoff and firing a person.  If you leave a person

5    that's 70 years old without a job and without any money,

6    you know they're not going to be able to get anything

7    else.

8    ·  Q.   Okay.  But we were talking about what was said to

9    you.

10       A.   He was a little upset when he called me.  He told

11   me to go collect unemployment.  That this was nothing

12   personal, but I said, why me?  I have seniority.  And he

13   said, I'm not following any of that.

14            MR. MARBAN:  No offense.  I think she said, I'm

15       not guiding myself by any of that.

16            THE INTERPRETER:  Okay.  I'm not guiding myself

17       by any of that.

18   MR. MARBAN:

19       Q.   All right.  So we're talking about what he told

20   you.  You definitely recall me using the words layoff in

21   Exhibit Number 4, correct?

22            MS. SORDO:  Objection to form.

23            THE WITNESS:  Yes.

24   BY MR. MARBAN:

25       Q.   It's written?

1    A.   Yes, yes.

2    Q.   And the layoff, didn't you understand that they

3    were layoffs that were taking place because Kendall

4    Group had been lost as a client?

5    A.   And why me?  Why did I have to be the one laid

6    off because that was not my department.

7    Q.   But it wasn't just you, it was three other

8    employees, right?

9    A.   Nothing to do with the others.  You said there

10   were more persons, I have nothing to do with the others.

11   Q.   All right.  But that's my question:  You do know

12   that in addition to yourself three other employees, four

13   including you, were being laid off?

14   A.   Yes.  But I mistakenly thought that I was doing a

15   very good job for the company, that I was not the person

16   that needed to be laid off.

17   Q.   Thanks for your answer.  Sometimes people don't

18   really understand what I'm asking, so thank you, but my

19   question is little bit different.  It happens to

20   everyone.  But you did know that in addition to yourself

21   three other employees were being laid off?

22        MS. SORDO:  Objection to the form.

23        THE WITNESS:  Yes.

24   BY MR. MARBAN:

25   Q.   Okay.  And you are familiar with the term lay

Page 57

1    off, are you not?

2        A.   Yes.

3        Q.   In fact, that's what you told Dr. Alvarez?

4        A.   Yes.

5        Q.   And when did you -- when did it occur to you,

6    when did you form the opinion that you were being laid

7    off because of your age?

8        A.   Because of the group that remained there, they

9    were all younger than me.  Even persons that had first

10   come in way after me.

11       Q.   You have no personal knowledge as to why Trail

12   Auto chose to lay off those three other people, correct?

13       A.   No.

14       Q.   And you have no personal knowledge as to why

15   Trail Auto chose to lay you off?

16       A.   No.

17       Q.   Okay.  Now, when you ceased to be employed

18   September 3rd, right, that was your last day after work,

19   2014?

20       A.   Yes.

21       Q.   You didn't seek a job referral company to get you

22   a job, right?

23       A.   Like unemployment?

24       Q.   No.  I'm talking about an employment agency.

25       A.   No.

1    Q.   Or you didn't go to any other person to try to

2    help you find a job, right?

3    A.   Immediately?

4    Q.   At any time after September 3rd, 2014.

5    A.   A month later.  A month later someone did me a

6    favor and got me a job that has nothing to do with what

7    I used to do, but I am working.

8    Q.   And very respectfully that's your daughter,

9    right, your daughter's law firm?

10   A.   Yes, yes.

11   Q.   About sometime in October?

12   A.   October.

13   Q.   And prior to the time that you went to work for

14   your daughter, did you attempt to get any type of work?

15   A.   I applied for unemployment.  I called several

16   work -- job centers.  At 70 years of age, nothing, and

17   then I started working with them.

18   Q.   Did you say that -- I thought you told me you did

19   not try to seek an employment agency to help you?

20   A.   Agency as such, unemployment.

21   Q.   You just applied for unemployment?

22   A.   Unemployment exactly.

23   Q.   But you did not try to get employment other than

24   going to work for your daughter?

25   A.   Only the unemployment application.

Page 59

1     Q.   So the answer to my question is yes, you did not

2   try to look for other employment?

3     A.   No.

4     Q.   Okay.  And working with your daughter you have a

5   $24,000 a year salary, correct?

6     A.   Yes.

7     Q.   And at Trail Auto you earned about $27,000 a

8   year; is that right?

9     A.   Yes.

10    Q.   And are you working for your daughter five days a

11  week?

12    A.   Four days.

13    Q.   And what hours do you work for your daughter?

14    A.   10:00 to 4:00.

15    Q.   So you're actually working less hours and making

16  more money?

17    A.   Yes.

18    Q.   And you haven't tried to look for any other

19  employment?

20    A.   No.

21    Q.   From your medical records -- and again, I

22  apologize, but I need to ask you this question.  Were

23  you taking medication for depression?

24    A.   Yes.

25    Q.   And anxiety also?

1    A.   Yes.

2    Q.   And you were suffering from depression and

3  anxiety when you were working at Trail Auto?

4    A.   Yes.

5    Q.   And didn't that affect your ability to work, if

6  you're suffering from anxiety and depression?

7    A.   It was under control.   It was controlled with

8  medication.

9    Q.   Are you taking any medication today that may

10  affect your testimony?

11    A.   No.

12    Q.   Are you feeling better?

13    A.   Not really.

14    Q.   Life is not easy?

15    A.   I know.

16    Q.   What damages, emotional damages, what are you

17  claiming in terms of emotional damages in this case?

18    A.   Emotional damages, there were many, humiliation,

19  to believe you're doing an excellent job and then you're

20  laid off with the first group, anguish, all the types of

21  anguish/anxiety worsened because I was under control.

22    Q.   How did they worsen?

23    A.   I had to go to the doctor because I was feeling

24  like -- you want details of why?

25    Q.   Since you're claiming emotional damages here, I

1  need to know exactly what emotional damages you're

2  claiming, so, yes, I want details.

3      A.   Okay.   I had episodes of trembling, my whole body

4  tremors.

5      Q.   When did that happen?

6      A.   Immediately between September, October, more or

7  less.   My hands were cold.   My whole head -- I felt like

8  my whole head was dazed or confused, sadness, a lot of

9  sadness because I never thought they were going to do

10  that to me.   I trusted that place a lot.

11      Q.   Anything else?

12      A.   No, what else.

13      Q.   All right.   I want to refer you to Dr. Alvarez's

14  records, it's Exhibit Number 3, it's page nine of 11,

15  dated 9/9/2014, about a week after you ceased to be

16  employed at Trail Auto.

17      A.   Okay.

18      Q.   I'm going to read it out loud to you.   The

19  patient feels better with the treatment.   She's taking

20  Sertraline, 100 milligrams daily in a.m. and, looks

21  like, BuSpar, B-U-S-P-A-R, five milligrams.   No side

22  effects reported.   Ms. Sordo states the anxiety and

23  depression have improved despite she's under stress

24  because of the illness of her mother.   And if you go a

25  line down it states, the patient has improved her

Page 62

1   motivation and she does not cry easily.  So is that a

2   correct statement that your emotional state of mind

3   improved a week after you stopped working at Trail Auto?

4       A.  When the doctor increased all the dosage.

5       Q.  And then you started feeling better, right?

6       A.  Somewhat, a little better.  She changed the

7   Sertraline from 50 to 100.

8       Q.  And your main concern, which would be anyone's

9   main concern, was, of course, your mother?

10      A.  I had the problem with my mother.

11      Q.  And your condition did improve?

12      A.  With the increase of medication, yes.

13      Q.  And you did suffer from anxiety and depression

14  before you stopped working at Trail Auto; is that

15  correct?

16      A.  Yes.

17          MR. MARBAN:  Okay.  Let me take a five-minute

18      break.  I think we're almost done.

19          (After a brief recess, the following proceeding

20  were had:)

21          MR. MARBAN:  Thank you very much.  I'll order.

22          MS. SORDO:  Read.

23          (The proceedings concluded at 12:47 p.m.)

24

25

Page 63

1        CERTIFICATE OF OATH OF THE INTERPRETER

2   STATE OF FLORIDA

3   COUNTY OF MIAMI-DADE

4

5        I, the undersigned Notary Public, in and for the

6   State of Florida, hereby certify that CRISTINA VELARDE

7   personally appeared before me and was duly sworn by me.

8

9        WITNESS my hand and official seal this 10th day of

10  December, 2015.

11

12  _____

13  STEFANY DE LEON

14  Notary Public-State of Florida

15  COMMISSION #EE221700

16  EXPIRES AUGUST 1, 2016

17

18

19

20

21

22

23

24

25